<span style="color:red">**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000803
06-APR-2020
07:46 AM**</span>

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

MAKILA LAND CO., LLC, Plaintiff-Appellant, vs.
HEIRS OR ASSIGNS OF APAA (k), et al., Defendants-Appellees

CAAP-17-0000803

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 02-1-0107(2))

APRIL 6, 2020

FUJISE, PRESIDING JUDGE, LEONARD AND CHAN, JJ.

OPINION OF THE COURT BY KATHERINE G. LEONARD, J.

Plaintiff-Appellant Makila Land Co., LLC (**Makila Land**)
appeals from a September 6, 2017 Final Judgment (**Judgment**),
entered by the Circuit Court of the Second Circuit (**Circuit
Court**),[1] in favor of Defendant-Appellee Ke'eaumoku Kapu (**Kapu**).
Makila Land also challenges the Circuit Court's: (1) September
23, 2016 Order Denying [Makila Land]'s Summary Judgment Motion

---

[1] The Honorable Peter T. Cahill presided.

for Dismissal of [Kapu]'s Title Claim (**Order Denying Second SJ Motion**); and (2) October 23, 2017 Order Denying [Makila Land]'s Renewed Motion for Judgment as a Matter of Law or, Alternatively, for New Trial (**Order Denying Renewed Motion for JMOL/New Trial**).

This case is on appeal for a second time, following the Intermediate Court of Appeals' (**ICA's**) April 28, 2006 Opinion, in which this court vacated the Circuit Court's previous award of summary judgment in favor of Makila Land. See Makila Land Co. v. Kapu, 114 Hawai'i 56, 74, 156 P.3d 482, 500 (App. 2006) (**Makila I**). The underlying dispute arises out of Makila Land's 2002 quiet title action with respect to a certain plot of land in the Kauaula Valley, in Lahaina, Maui (**'āpana 1**),[2] to which Kapu asserted a claim to title. On remand, Makila Land filed, inter alia, an August 6, 2015 Summary Judgment Motion for Dismissal of [Kapu]'s Title Claim (**Second SJ Motion**), which the Circuit Court denied. After trial, a jury returned a verdict that Makila Land did not have an interest in 'āpana 1 and that Kapu did. Subsequently, Makila Land filed a Renewed Motion for Judgment as a Matter of Law or, Alternatively, for New Trial (**Renewed Motion for JMOL/New Trial**), which the Circuit Court denied.

On appeal, Makila Land seeks to overturn the jury verdict in favor of Kapu, vacate the Circuit Court's denial of Makila Land's Second SJ Motion and its Renewed Motion for JMOL/New Trial, and a holding that, as a matter of law, Kapu's

---

[2]    An 'āpana is a "[p]iece, slice, portion, fragment, section, segment, installment, part, land parcel, lot district, sector, ward, [or] precinct[.]" Mary Kawena Pukui & Samual H. Elbert, Hawaiian Dictionary 28 (rev. ed. 1986).

claim to title to 'āpana 1 fails, and Makila Land is the sole owner of 'āpana 1. We affirm.

I.    BACKGROUND

On March 4, 2002, Makila Land filed the Complaint in this action, seeking to "determine all claims adverse to, and to establish [Makila Land]'s fee simple title" to 'āpana 1, which was awarded to Apaa (k) (**Apaa**) by way of Land Commission Award (**LCA**) 6507, Royal Patent 3457 on September 15, 1857.[3]    The Complaint alleged that Apaa did not convey 'āpana 1 during his lifetime and that he died intestate, whereupon title descended to his son, Momona.  The Complaint further alleged that Momona conveyed 'āpana 1 by Deed dated September 20, 1892, to Paul Isenberg (**Isenberg**) and C.F. Horner (**Horner**), after which title vested by mesne conveyances in Makila Land.  According to the Complaint, Makila Land and its predecessors were in adverse possession of 'āpana 1 for the requisite time period and that the claims of all persons of an estate or interest in 'āpana 1 adverse to Makila Land's fee simple title are barred.  The Complaint sought a declaration that Makila Land is the owner in fee simple of 'āpana 1.

---

[3]    The parties do not dispute the basic history of land grants in Hawai'i in the mid- to late-1800s, which the Hawai'i appellate courts have previously recounted. Specifically, in 1845, the Board of Commissioners to Quiet Land Titles (**Land Commission**) was established "to investigate and settle all land claims of private individuals, whether native or foreign." Makila I, 114 Hawai'i at 58, 156 P.3d at 484 (citation omitted).  Upon confirming an individual's claim, the Land Commission issued the LCA of that land to the claimant.  Id.  After the Land Commission entered the LCA, the Minister of Interior could issue a Royal Patent after the awardee paid a commutation fee. Omerod v. Heirs of Kaheananui, 116 Hawai'i 239, 247, 172 P.3d 983, 991 (2007). A Royal Patent was, in essence, a quitclaim of the Hawaiian government's prior interest in the pertinent land.  Id.

On May 2, 2002, Kapu filed an answer, asserting his rights as a lineal descendent of Apaa.[4]  On March 24, 2003, Makila Land filed Plaintiff's Summary Judgment Motion (**First SJ Motion**), which was the subject of the appeal in Makila I.  In the motion, Makila Land argued only its paper title claim,[5] asserting that while Apaa's heirs were never judicially determined, Momona's recitation in an 1872 lease that Apaa was his father, evidenced that title descended from Apaa to Momona.  Makila Land attached to its First SJ Motion, inter alia, a copy of a translation by Frances N. Frazier (**Frazier**) of the lease, which concerned only 'āpana 2 and 3 of LCA 6507, and included the following relevant language:  "I received this parcel [sic] of land from Apaa, my own father and this property of Apaa is described in Royal Patent No. 3457, Land Commission Award No. 6507[.]"  ("[sic]" in original).  Makila Land posited that the 1872 lease, together with the subsequent deed conveying 'āpana 1, 2, and 3 to Isenberg and Horner and the mesne conveyances to Makila Land, established that title to 'āpana 1 is vested in Makila Land as a matter of law.

Kapu opposed the First SJ Motion, arguing, as an initial matter, that the 1872 lease does not pertain to, or assert any claim in, 'āpana 1 and therefore is not relevant or admissible evidence in support of Makila Land's motion.

---

[4]  Defendant July Simeona filed an objection on March 27, 2002, the disposition of which is discussed below.

[5]  Makila Land's adverse possession claim was later dismissed by way of the Circuit Court's June 20, 2017 Order Granting in Part and Denying in Part [Kapu]'s Motion for Summary Judgment.  Makila Land does not challenge that dismissal on appeal.

Additionally, Kapu asserted that Frazier improperly translated the word "makuakane" contained in the 1872 lease to mean only "my own father," as opposed to having alternate meanings. Consequently, the 1872 lease did not prove that Momona was the son of Apaa or that Momona inherited 'āpana 1 by way of intestate succession. In support, Kapu provided the original Hawaiian version of the 1872 lease, as well as an affidavit from his brother, Kalani Kapu (**Kalani**) (**Kalani Affidavit**), attesting as to Kalani's ability to speak, read, and write the Hawaiian language and asserting that "makuakane" includes male relatives, such as uncles or cousins. According to Kapu, this constituted a break in the chain of title to Makila Land.

Kapu also asserted that Apaa was survived by his wife, Kekue, also known as Kekua (**Kekue** or **Kekua**), and their son Kamokulewa[6] and that Kekue is described as the owner of the property in certain survey notes pertaining to 'āpana 1 after Apaa died, creating a question of material fact as to Momona's ownership in 'āpana 1. Kapu attached the survey notes to his opposition, with a translation that included, in relevant part, that it was the "[s]urvey of a kuleana land belonging to Kekua, the widow of Apaa. Apaa is the awardee of L.C.A. 6507, situate in the ahupua'a of Ko'oka, at Lahaina, Maui."

According to Kapu, Makila Land had failed to support its claim of paper title, and Kapu did not have to make any showing. Nevertheless, the Kalani Affidavit set forth two,

---

[6] Kamokulewa is also known, and referred to occasionally by the parties, as Mokulewa. For consistency with Makila I, he will be referred to as Kamokulewa.

albeit conflicting, genealogies for Kapu based on Kekue having survived Apaa. In sum, Kapu put forth three alternate theories of how title to 'āpana 1 passed from Apaa: (1) from Apaa to Namauu, a successor land agent; (2) from Apaa to his widow Kekue; and (3) from Apaa to his son Kamokulewa.[7] See Makila I, 114 Hawai'i at 65, 156 P.3d at 491.

After a hearing on the motion, the Circuit Court[8] entered its May 7, 2003 Order Granting [Makila Land]'s Summary Judgment Motion (**Order Granting First SJ Motion**), concluding:

> The record shows that there is an absence of evidence to support the claims of July Simeona and [Kapu], that there is no genuine issue of material fact relative to [Makila Land]'s title to the land, and that [Makila Land] is entitled to judgment as a matter of law.

On May 15, 2003, the Circuit Court entered judgment in favor of Makila Land and against July Simeona and Kapu.

Following Kapu's appeal therefrom,[9] this court concluded that summary judgment was erroneously granted to Makila Land. Makila I, 114 Hawai'i at 74, 156 P.3d at 500. We first determined that Makila Land had presented evidence that: (1) Apaa died and was survived by his son Momona; (2) by operation of the law of intestacy, 'āpana 2 and 3 passed to Momona from Apaa, his "makuakane," and by inference also 'āpana 1; (3) in 1872, Momona leased 'āpana 2 and 'āpana 3 to John O. Dominis; (4) in

_____

[7] This court in Makila I described more specifically the three alternate theories of title and noted that the record did not show how Kekue received 'āpana 1 from Apaa or how Kapu or his ancestors received the land from Kamokulewa. 114 Hawai'i at 65, 65 nn. 29, 30, 156 P.3d at 491, 491 nn. 29, 30.

[8] The Honorable Shackley F. Raffetto presided.

[9] July Simeona does not appear to have filed an appeal challenging the Order Granting First SJ Motion or otherwise participated further in the proceedings.

1892, Momona conveyed the land described in Royal Patent No. 3457, LCA No. 6507, to Isenberg and Horner; and (5) the chain of title from Isenberg and Horner to Makila Land was unbroken. Id. at 61, 156 P.3d at 487.

We further determined that: (1) there was conflicting evidence with respect to the relationship between Apaa and Momona, and thus whether another individual had inherited ‘āpana 1; and (2) there was evidence of Kekue as the record owner, to wit: the survey notes submitted by Kapu, which refuted Makila Land's claim that Momona received ‘āpana 1 from Apaa. Makila I, 114 Hawai‘i at 74, 156 P.3d at 500. With respect to the bases for Kapu's various claims, this court explained:

> [Kapu]'s support for his claim of genealogical descent from Kekue is Kalani's Affidavit, which in turn is "supported by the oral history of [the Kapu] family." While "an affidavit consisting of inadmissible hearsay cannot serve as a basis for awarding or denying summary judgment[,]" family oral history can reasonably be viewed as an exception to the hearsay rule under HRE Rule 804.[10] These statements allege [Kapu]'s genealogical descent from Kekue, and present [Kapu] as a viable claimant with standing to contest [Makila Land]'s assertion of ownership of ‘āpana 1.

Id. at 73, 156 P.3d at 499 (citation omitted). Accordingly, this

---

[10] Hawai‘i Rules of Evidence (**HRE**) Rule 804 provides, in pertinent part:

> **Rule 804 Hearsay exceptions; declarant unavailable.**
> . . . .
> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
> . . . .
> (4) Statement of personal or family history. (A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history, even though declarant had no means of acquiring personal knowledge of the matter stated[.]

court vacated the Circuit Court's Order Granting First SJ Motion and remanded the case for further proceedings. Id.

Also, regarding Kapu's theory that Kamokulewa was the son and heir of Apaa, we opined that while the Kalani Affidavit established Kamokulewa as a possible rival heir to Momona for 'āpana 1, Kapu did not provide any evidence that he would have received land from Kamokulewa and therefore his claim of ownership through Kamokulewa must fail. As to the claim through Namauu, this court determined that based on the applicable intestacy laws, Namauu, as a "King's Agent" could not have inherited the contested property. Id. at 74, 156 P.3d at 500.

Although the ICA's judgment on appeal remanding the case was entered in June 2006, the next substantive filing[11] in the record did not occur until Makila Land's October 10, 2013 Motion to Preclude Testimony by Kalani Kapu — based on Makila Land's inability to serve Kalani with a subpoena to appear at a deposition - which the Circuit Court denied on November 21, 2013.[12]

On March 30, 2015, the Circuit Court entered an Order Granting [Makila Land]'s Motion to Compel Discovery, ordering Kalani to produce a "Family Book" and a particular marriage

---

[11] During 2008 and 2009, Makila Land filed various Notices of Taking Deposition Upon Oral Examination.

[12] On August 11, 2014, Makila Land filed a Motion to Preclude Trial Testimony by Tammy Harp, who had testified during her deposition that she did not want to participate in the proceeding. The Circuit Court entered an order denying the motion on October 17, 2014.

certificate referred to in his deposition.[13]   Upon Kapu and Kalani's failure to produce either document, Makila Land moved for sanctions, including an order prohibiting Kapu from submitting any evidence or testimony regarding the Family Book and marriage certificate, which the court granted.

On August 6, 2015, Makila Land filed the Second SJ Motion.  In short, Makila Land argued that Kapu's only remaining chain of deeds, devises, and descents — as set forth in the Kalani Affidavit[14] — was unsupported by admissible evidence in the record and that, accordingly, Makila Land was entitled to judgment dismissing Kapu's title claim to 'āpana 1.  Makila Land characterized Kalani's genealogical statements in his affidavit as inadmissible hearsay, based on his testimony during his deposition that they were based on "speak[ing] with the elders of the family, whoever is still here today," and that Kapu's purported chain of title from Apaa was not supported by any other evidence.  Makila Land also asserted that, to the extent Kapu's chain of title depended upon the intestate succession from John Manuia Kekai to his daughter Julia Kealani Kapu, the laws regarding illegitimacy precluded such a succession.

---

[13]     In his deposition, as attached to Makila Land's Motion to Compel Discovery, Kalani referred to the "family books that they had put together for the family reunions, that would have the individual's names and who they were married to."

[14]     Specifically, Kalani had set forth the following genealogy:  (1) Kekue, who survived Apaa, married Keawe Haia, who survived Kekue; (2) Keawe Haia's interest passed to his brother Haia Kekai, whose interest then passed to his son John Manuia Kekai; (3) John Manuia Kekai's interest passed upon his death to his daughter Julia Kealani Kapu; and (4) Julia Kealani Kapu's interest passed upon her death to John Paul Kekai Kapu, Kapu's father, who had since transferred the interest in 'āpana 1 to Kapu.

On August 25, 2016,[15] Kapu filed his opposition to Makila's Second SJ Motion, relying on this court's opinion in Alexander & Baldwin, Inc. v. Silva, 124 Hawai'i 476, 487, 248 P.3d 1207, 1218 (App. 2011) (**A & B**), to argue that a quiet title defendant does not need to prove perfect title in order to defeat a motion for summary judgment to dismiss the defendant's claim. Kapu further argued that the ICA in Makila I had previously rejected Makila Land's argument with respect to the admissibility of the Kalani Affidavit. See 114 Hawai'i at 73, 156 P.3d at 499. Kapu also attached copies of foreign and native testimony, as well as a copy of LCA 6507, to support his claim that Kekue received 'āpana 1 from Apaa. With respect to Makila Land's argument regarding the illegitimacy of Julia Kapu, Kapu argued that while the Revised Laws of Hawai'i (**RLH**) prevented an illegitimate child from inheriting, the RLH were not in effect at the time of Julia Kapu's birth and, alternatively, that there was a basis for retroactive invalidation of the law as unconstitutional. Accordingly, Kapu argued that Makila Land had failed to establish an absence of evidence to support the necessary elements of Kapu's claim in order to prevail on summary judgment.

During a September 2, 2016 hearing on the Second SJ Motion and after entertaining argument by the parties, the Circuit Court reiterated this court's holding in Makila I that

---

[15] With respect to the one-year delay between the filing of the Second SJ Motion and Kapu's response, the proceedings were apparently continued after Kapu's former counsel passed away unexpectedly in December 2015.

the Kalani Affidavit fell within the hearsay exceptions for family oral history and that it could be used to defeat Makila Land's claim. The Circuit Court also noted that Makila Land filed motions to preclude the testimony of the family members Kalani spoke to and that it could not "use their silence" to discredit Kalani's statements about the Kapu family history. The Circuit Court repeatedly noted that the issue was "confusing," but determined that "there are some questions of fact in dispute" and denied the motion. On September 23, 2016, the Circuit Court entered the written Order Denying Second SJ Motion.

On February 10, 2017, Makila Land again filed a Summary Judgment Motion for Dismissal of [Kapu]'s Title Claim (**Third SJ Motion**), which the Circuit Court appears to have treated as a motion for reconsideration of its Order Denying Second SJ Motion.[16] The Circuit Court heard the motion at a hearing on March 17 and a continued hearing on March 31, 2017. Makila Land again emphasized that it was "moving to have the claim of [Kapu] dismissed for his failure to present evidence to sustain his burden of proof." Specifically, Makila Land argued there was no evidence in any of the affidavits about how title passed from Apaa to Kekue. In denying the motion, the Circuit Court again cited Makila I's conclusion that "[Kapu]'s support for his claim of genealogical descent from Kekue is Kalani's affidavit . . . .

---

[16] In the Third SJ Motion, Makila Land cited this court's memorandum opinion in Makila Land Co. v. Kapu, CAAP-12-0000547, 2016 WL 6136995 (Haw. App. Oct. 21, 2016) (mem. op.), in which this court affirmed the dismissal of Kapu's adverse possession counterclaims in a separate, unrelated quiet title action and discussed the applicable summary judgment burdens and standards.

These statements allege [Kapu]'s genealogical descent from Kekue, and present Kapu as a viable claimant with standing to contest [Makila Land]'s assertion of ownership of 'āpana 1." 114 Hawai'i at 73, 156 P.3d at 499. The Circuit Court entered a written order denying Makila Land's Third SJ Motion on April 11, 2017 (**Order Denying Third SJ Motion**).[17]

Prior to trial, Makila Land filed Motion in Limine No. 1 to Preclude Testimony from Victoria Quilani White (**White**) (**Motion to Preclude White Testimony**), based on her failure to appear at her deposition. Kapu filed Motion in Limine No. 1, seeking to exclude argument or evidence referencing the illegitimate status of Julia Kealani Kapu's birth (**Motion to Exclude Evidence of Illegitimacy**), and Motion in Limine No. 2, seeking to exclude any and all reports, declarations, translations from Frazier (**Motion to Exclude Frazier Translation Evidence**). Following a May 5, 2017 hearing on the various motions, the Circuit Court: (1) granted Makila Land's Motion to Preclude White Testimony; (2) denied Kapu's Motion to Exclude Evidence of Illegitimacy; and (3) granted in part Kapu's motion to Exclude Frazier Translation Evidence, to the extent that Frazier's report would not be permitted or received as a separate exhibit, but that Makila Land would be permitted to elicit testimony from another expert witness who relied upon Frazier's translations.

---

[17] The Circuit Court subsequently denied Makila Land's motion to allow an interlocutory appeal from this order.

Kapu also filed a Motion for Summary Judgment with respect to Makila Land's paper title and adverse possession claims. In short, Kapu argued that the Land Commission had determined that Kekue and Kamokulewa were the heirs of Apaa and that a claim that Momona was the heir to Apaa was barred under *res judicata*. Following a June 2, 2017 hearing on the motion, the Circuit Court denied Kapu's motion with respect to Makila Land's paper claim and granted it with respect to the adverse possession claim.

The Circuit Court held a jury trial on June 19, 2017, and from June 21 to June 23, 2017. Colleen Uahinui (**Uahinui**) testified first for Makila Land. Uahinui is a Lead Senior Title Abstractor in the Historic Title Services Department of Title Guaranty of Hawaii, where her specialty is conducting title searches for Hawaiian land titles dated from 1845 through the present. The Circuit Court qualified Uahinui as an expert for the purpose of rendering opinions in the area of Hawaiian land title searching. Makila Land sought to admit Uahinui's resume into evidence, to which Kapu objected on the grounds that it is hearsay. The Circuit Court sustained the objection, noting that the resume was "cumulative as well."

With respect to 'āpana 1, Uahinui opined that Makila Land is the title holder and presented a chart she had prepared showing the chain of title from Apaa. Uahinui explained that she used the grantor/grantee index volumes of the Bureau of Conveyances to conduct her search. Because "everything is name based," Uahinui started with the name "Apaa" for her searches.

Uahinui then described her search for each point on the chain of title chart, beginning with LCA 6507 issued to Apaa on October 1, 1852, for his property, which included three separate 'āpana. Uahinui clarified that the first document for LCA 6507 "deals with only ['ā]pana 1" and that 'āpana 2 and 3 "were issued by [a] separate document." She also explained that because LCA 6507 was drafted in Hawaiian, she was not familiar with the contents of the LCA itself, and she used a 1928 book called The Indices of the Land Commission Awards to locate LCA 6507 by number and view the information.

Additionally, the name "Apaa" appeared in foreign and native testimony documents,[18] which described "Section 1" of land "bound mauka by Manu's land; Oluwalu by Namauu Ehu's land; makai by Haole's land; Kaanapali by Keaka's land," but Uahinui could not be sure whether this referred specifically to 'āpana 1. The document stated that Apaa had died in 1848, prior to the issuance of the LCA. The testimony also noted his heirs as Kekue, his widow, and Mokulewa, also known as Kamokulewa, his son.[19] Uahinui then found that after the LCA was issued to Apaa, he was issued the Royal Patent on December 16, 1856.

Uahinui ran searches for both Kekue and Kamokulewa as well but did not locate any conveyances for either. She did,

---

[18]   According to Uahinui, "testimony" refers to the testimony given by a witness before the Land Commission when seeking an LCA, as part of the application process. Those testimony transcribed in English are referred to as "foreign testimony" while those transcribed in Hawaiian are referred to as "native testimony."

[19]   Uahinui noted that the native testimony translation included a line stating, "Note: Translation revised 2017," but she was unsure what that referred to.

however, locate a November 6, 1872 lease from an individual named Momona to West Maui Sugar Company for ʻāpana 2 and 3. The lease, written in Hawaiian, was translated by Frazier in 1990, and included the translation of the phrase "kuu makuakane ponoi" as "my own father," which Uahinui noted on her chart. The lease and the translation were admitted over Kapu's objection. Uahinui also located a second lease, drafted in English, again for ʻāpana 2 and 3 from "W. Momona" to Campbell and Isenberg, dated August 27, 1888.[20] Uahinui conceded that nowhere on the chart did it refer to Momona as an heir of Apaa and also testified that other than the documents with respect to LCA 6507, there were no other documents referring to Momona.

Uahinui then located an 1892 deed conveying all three ʻāpana included in LCA 6507 from "K.W. Momona" to Isenberg and Horner. Again, because the deed was in Hawaiian, which Uahinui could not understand in full, she relied on a 1985 translation by Frazier. The deed and the translation were admitted into evidence over Kapu's objection. Uahinui next located a deed from Isenberg and Horner to Pioneer Mill, dated June 29, 1895. She explained that this deed conveyed several pieces of land from Isenberg and Horner, including that which K.W. Momona had conveyed to Isenberg and Horner in 1892. Finally, Uahinui's chain of title included the deed and reservation of rights from Pioneer Mill to Makila Land, which specifically referred to

---

[20] During cross-examination, Uahinui explained that the exhibits provided are not actual copies of the leases but are transcriptions of what was given to the Bureau of Conveyances.

"Royal Patent 3457, Land Commission Award Number 6507, 'āpana 1, to Apaa."

During Uahinui's testimony, Makila Land sought to introduce various exhibits with respect to 'āpana 2 and 3, including copies of: (1) a 1990 Judgment in a condemnation case filed against Pioneer Mill with respect to 'āpana 2 (**1990 Judgment re 'āpana 2**); (2) a 1991 quiet title judgment in favor of Pioneer Mill for 'āpana 3 (**1991 Judgment re 'āpana 3**); and (3) a 2001 warranty deed, conveying 'āpana 3 from Pioneer Mill to the County of Maui (**'āpana 3 Deed**). Kapu objected to their admission, and counsel and the Circuit Court engaged in a lengthy exchange outside the presence of the jury and witnesses. Makila Land argued that the exhibits demonstrated "the consistency and continuity of [Uahinui's] description of the chain in 'āpana 1, and this is one of the other two 'āpanas in addition to 'āpana 1 and this shows that it came down exactly the same way." Agreeing with Kapu, the Circuit Court explained that the documents lacked relevance, as they failed to refer to 'āpana 1, and could lead to confusion because they could be viewed as an attempt to show as an "irrefutable fact" that Momona also had title to 'āpana 1, and excluded the exhibits.

Doris Moana Rowland (**Rowland**) testified next for Makila Land. In her capacity as an abstractor with the Division of Forestry and Wildlife of the Department of Land and Natural Resources, Rowland researches Hawaiian land titles from 1845 through the present. She also has a consulting business in which she translates legal Hawaiian documents into English. Rowland

16

was qualified as an expert witness in translating documents from Hawaiian into English. As with Uahinui, the Circuit Court excluded the admission of Rowland's resume into evidence.

Rowland testified that she completed a translation for LCA 6507, which included two separate documents, one relating to 'āpana 1 and another relating to 'āpana 2 and 3. Rowland also completed the translation of Royal Patent 3457. Rowland read from her translation of LCA 6507, which states, in part: "A survey description of Kekua's land claim, being the widow of Apaa, for Land Commission Award 6507, situated in the land division of Kooka at Lahaina, island of Maui." According to Rowland, the phrase "Kekua's land claim" was translated from the Hawaiian phrase, "aina kuleana a Kekua." Rowland explained that "aina" means land, "Kuleana" is interest, "a" is a possessive meaning of or belonging to, while "Kekua" referred to a person by that name, and that it could also be translated as "Kekua's land."

Rowland testified that she had reviewed and agreed with the Frazier translations of the 1872 lease and the 1892 deed. Rowland then testified that the phrase, "Apaa kuu makuakane ponoi," from the 1872 lease should be translated to mean, "Apaa, my own father." In arriving at this translation, Rowland noted the significance of "ponoi" — meaning, "own" — combined with "makuakane" meant that the proper translation was "my own father."

Rowland reviewed an excerpt from the <u>Hawaiian Dictionary</u> by Pukui and Elbert, which included the word

"makuakane" and the noun "father" as the very first word following it. During cross-examination, however, she noted that the second and third definitions were "uncle" and "male cousin of parents' generation." She also noted that in the same dictionary, the first Hawaiian word appearing under the definition of uncle is "makuakane." Additionally, she reviewed a legal Hawaiian translations dictionary by Paul Lucas, which similarly defined makuakane as "father." During cross-examination, she read the other definitions for makuakane, to include uncle, cousin, or husband of one's mother. Rowland testified, however, that with respect to the phrase in the 1872 lease, she was very confident with her translation as "my own father," because the use of the full phrase "kuu makuakane ponoi" indicates that the relationship is father as opposed to one of the other meanings.

Heidi Bigelow (**Bigelow**) testified next for Makila Land. Bigelow is a project manager with West Maui Land Company, which is the land manager for Makila Land Company. According to Bigelow, Makila Land purchased ʻāpana 1 from Pioneer Mill Company. In support of this conclusion, Bigelow identified a deed, dated January 16, 2001, which included several parcels, as well as the "subject Land Commission Award." Bigelow testified that with respect to real property taxes, Makila Land pays them and Bigelow is not aware of anyone else paying real property taxes on LCA 6507. She also described Makila Land's use of the land subject to LCA 6507, including a water pipeline which

travels down to their hydro plant, as well as an access road and irrigation system.

Bigelow testified that Makila Land authorized a research study with respect to the various Land Commission Awards in and near the Kauaula Valley. The proffered excerpts of the study were excluded following Makila Land's objection and Bigelow did not further testify with respect to its contents. Bigelow testified that she does not have family or relatives living in Kauaula Valley and has not conducted any research into the existence of someone named Momona in the nineteenth century.

Following Makila Land's case-in-chief, Kapu moved for judgment as a matter of law, which the Circuit Court denied.

Harold Mele Pang (**Pang**) testified first for Kapu. Pang is fluent in the Hawaiian language and has been a Hawaiian language teacher with Kamehameha High School Kapalama since 1993. He is also a member of ʻAhahui ʻŌlelo Hawaiʻi, which is a society for Hawaiian language professionals. Over Makila Land's objection, the Circuit Court — citing Pang's education, background, training, and twenty-five years as a teacher with Kamehameha Schools — qualified Pang as an expert witness with respect to the Hawaiian language and translations from Hawaiian into English and English into Hawaiian.

Pang had prepared his own translations of LCA 6507 and Royal Patent 3457. Pang translated the two LCA 6507 documents in two separate translations. Pang acknowledged that one of his translations indicates it is for "Number 1501(?) Apaa," because this is what "was legible to [him] at the time."

According to Pang, LCA 6507 reads: "[Apaa] claims his property is at Kooka, Lahaina, Maui, because he received these properties belonging to Hoapili in the year 1831 and he has resided there until his death in the year 1848, except for his heirs, Kekua, his wife, and Mokulewa, who resided there without objection until now." With respect to 'āpana 1, Pang translated LCA 6507 to state: "Here is a conveyance of a land award belonging to Kekua, who is the widow of Apaa, whose Land Commission Award No. 6507, which is situated in the land division of Kooka (Kahoka) in Lahaina, on the island of Maui." Pang translated the phrase, "a land award belonging to Kekua" from the Hawaiian phrase, "[h]e palapala hoakaka i ke ana ana i kekahi apana kuleana a Kekua."

Upon cross-examination, Pang conceded that during his deposition, he had testified that one of the translations of "Apaa kuu makuakane ponoi" was "Apaa who is my father" and had also declined to definitively state his translation of the phrase. During re-direct, he explained that, depending on the "cultural perception and context," "kuu makuakane ponoi" could mean "my own beloved father," "my beloved uncle," or "my beloved elder male cousin." He admitted that he was not familiar with the cultural context of this particular family but testified that he was familiar with respect to general Hawaiian society at the time.

With respect to the Hawaiian Dictionary, Pang testified that the Hawaiian definition for "uncle" included "makuakane" and "anakala." According to Pang, the word "anakala" is the

Hawaiianized pronunciation of uncle, which came in to use in the early 1900s after the ban of the use of the Hawaiian language in schools. Prior to that, "makuakane" would be used generally to refer to various male relatives without differentiation. Makila Land stated its objection to this testimony on the basis that Pang was not qualified as an expert in the history of the Hawaiian language, which the Circuit Court overruled.

Kalani testified next for Kapu. Kalani testified that he was familiar with his family's genealogical history and had started researching the genealogy in 1978 to establish their family's Hawaiian heritage in another matter. After resolving that matter, he continued to conduct genealogical research together with his sister, regularly meeting with family members to discuss family history. According to Kalani, it is common for government records of Hawaiian births, deaths, and marriages to have multiple alternate spellings for names, to have first and last names switched, and to have a parent's name added to a child's name if there is no surname.

Kalani identified copies of the following documents, which were admitted into evidence: (1) the death certificate for Kalani's and Kapu's great-grandmother, Julia Kekai, also known as Julia Keanae Manuia; (2) the death certificate for Kalani's and Kapu's grandmother, Julia Kapu; (3) the birth certificate for Kalani's and Kapu's father, Paul Kekai Kapu; (4) Kapu's birth certificate; (5) the death certificate for Kalani's and Kapu's great-grandfather, John Manuia Kekai; (6) a quitclaim deed, recorded on July 7, 1999, from Paul Kekai Kapu to his children,

21

including Kalani and Kapu; (7) probate documents for Kalani's and Kapu's grandfather, John Manuia Kekai, Jr.; (8) the death certificate for Kalani's and Kapu's great-great-grandfather, Kekai; (9) the death certificate for Kekai's brother, Pili Kekai; (10) the claim of Apaa for the LCA, with translation provided by the State Archives; (11) the survey notes for Royal Patent 3457, with translation provided by the State Archives; (12) foreign testimony with respect to a separate parcel of land, which referred to Kekua and Apaa and indicated that "Kekua appeared and said, She drove [an individual] from the land because he did not pay a tax of 25 cents"; (13) an 1878 Hawaiian Census Table, listing Keawe and Kekua.[21]

With respect to the survey notes, Kalani read aloud the portion which states: "Survey of Kuleana Land Belonging to Kekue, the Widow of Apaa. Apaa is the awardee of Land Commission Award 6507, situate in the Ahupuaʻa of Hoʻoka at Lahaina, Maui." Following Makila Land's objection, the Circuit Court provided the following limiting instruction to the jury:

> With respect to the exhibit that's been received as D-2, as to this particular sentence which there's been questions upon, you're not to consider it -- you're not to consider this as the surveyor's opinion of who this land was owned by because the surveyor may or may not be qualified to give that opinion. . . . However, you may consider it as the surveyor's statement as who Kekue was and who she was married to and who Apaa was married to.

Kalani then presented the following genealogy for himself and Kapu: Apaa was married to and predeceased Kekue. Kekue re-married a man named Keawe Haia, Jr., who had a brother

---

[21] Following Makila Land's objection, the Circuit Court excluded Kapu's exhibit that included a copy of a report of the Maui Burial Council relating to family graves on ʻāpana 1.

named Kekai, known also as Haia Kekai or Kekai Haia (**Haia Kekai**).[22] Their father was known simply as Haia.[23] Haia Kekai had a son named John Manuia Kekai, who was also known as John Manuia. John Manuia had a son named John Manuia Kekai, Jr., who had no children, and a daughter named Julia Kapu, who was the grandmother of Kalani and Kapu. One of Julia Kapu's children was Kalani's and Kapu's father, Paul Kekai Kapu.

Kalani explained the chain of title to 'āpana 1 based on his family history. According to Kalani, Kekue received title to 'āpana 1 directly from the Land Commission "but also through the death of her husband." With respect to the relative dates of death for Kekue, Keawe Haia, Jr., and Kamokulewa, Kalani held the following exchanges with Kapu's counsel:

> Q. And did Keawe Heia, Jr., live longer than Kekua?
>
> A. Yes, he preceded his wife.
>
> Q. And as far as you know, Kekua and Keawe Heia, Jr., did not have any children; correct?
>
> A. No.
>
> Q. And Heia died way before Keawe Heia, Jr. Correct?
>
> A. Yes.
>
> Q. So based on your family research and understanding, the person Mokulewa passed away before Kekua. When Kekua and Keawe Heia, Jr., were married, Mokulewa had already passed away; correct?
>
> A. I don't think I can answer that question, yeah.
> . . . .
>
> Q. . . . . So earlier you said that you couldn't comment on whether Mokulewa predeceased Kekua; correct?
>
> A. Yes.

---

[22] The transcripts consistently include "Heia" as the spelling for "Haia." However, the documents (and the parties) appear to be in agreement that the correct spelling is "Haia."

[23] Haia received his own land grant, LCA 7719.

> Q. So let me ask the question in a different way: When Kekua remarried and she married Keawe Heia, Jr., from your family research, were you aware that she had any living children at that time?
>
> A. No.

Keawa Haia, Jr., passed away without any living children or parents. When his brother, Haia Kekai, passed away, he had several children, including his son, John Maniua Kekai, Sr. John Maniua Kekai, Sr.'s interest from Haia Kekai passed to his children, including John Manuia Kekai, Jr., which was then conveyed by probate to Paul Kekai Kapu, his nephew and father to Kalani and Kapu. Paul Kekai Kapu conveyed his interest by deed to Kalani and Kapu.

During cross-examination, Kalani testified that he did not know the dates of birth or death of Kekue or Kamokulewa and that he had "never heard of" Momona. He stated, however, that according to his "family oral history" he knows that Kamokulewa died before Kekua but that he did not have any documents in support. He similarly had no document to show that Keawe Haia, Jr., survived Kekue. He testified, however, that he could demonstrate that Keawe Haia, Jr., was married to Kekue by way of the 1878 census report and that Keawe Haia, Jr., and Haia Kekai were brothers based on Haia Kekai's death certificate listing Haia as his father and the native testimony of Haia's LCA, which indicated his son was Keawe Haia, Jr.[24] According to Kalani, Keawe Haia, Jr.'s, and Haia Kekai's parents were Haia and Pihei, and they had four sisters as well.

---

[24] This native testimony was submitted by Makila Land and included a translation by Rowland.

Regarding Kalani's and Kapu's grandmother, Julia Kapu, Kalani denied that she was the illegitimate child of John Manuia Kekai, Sr. He admitted that he had stated during his deposition that she was illegitimate because he did not have any documents to prove that she was not an illegitimate child but that he had since viewed her death certificate, which lists John Manuia[25] (a.k.a. John Manuia Kekai, Sr.) as her father.

Kalani was then presented with a copy of a 1997 affidavit signed by his father (**Paul Kapu Affidavit**) in which he claimed to be the owner and successor of various parcels of land. Upon review, Kalani conceded that the affidavit did not cite any of the names in Kalani's proffered genealogy and did not include any claims to any of the 'āpana included in LCA 6507. The Circuit Court sustained Kapu's objection to the admission of the affidavit.

Kalani was also presented with the Kalani Affidavit — the 2003 affidavit Kapu had previously attached in support of his opposition to Makila Land's First SJ Motion. Kalani testified that his sister, White, prepared the affidavit and that she is the head genealogist and they work on their genealogy together. Also, after opposing counsel noted that Kalani's affidavit discussed Momona and the proper translation of "makuakane," Kalani clarified his previous comment that he had "never heard of" Momona, explaining that he had never conducted research on

---

[25] Julia Kapu's death certificate in fact lists "Manuwia Kekai" as her father, but the parties do not appear to dispute that John Manuia Kekai, Sr., is the father of Julia Kapu.

him.    The Circuit Court sustained Kapu's objection to the admission of the Kalani Affidavit into evidence.

Kalani admitted that no one in his genealogy had conveyed by deed, made any public financial disclosures of ownership, leased to a third party, had a will that mentioned, or paid real property taxes for LCA 6507 or used LCA 6507 to secure a loan or mortgage.

On cross-examination, Kalani was also presented with a probate document for "Haia Kekai, also known as Pili Kekai," listing "Moses Haia Kekai" and "Emily Keahi" as heirs, with which Kalani "disagree[d]."  He also did not believe that Pili Kekai and Haia Kekai, his great-great-grandfather, were the same person.  He clarified on redirect that Pili Kekai was the brother of his great-grandfather, John Manuia Kekai, Sr., and he was unsure why the probate document referred to Pili Kekai as Haia Kekai.  Kalani conceded that the probate document did not include any reference to LCA 6507 as having been owned by Haia Kekai or Pili Kekai, while there were other lands alleged to have been owned by Haia Kekai.  He also noted that John Manuia Kekai, Sr., was not referred to as an heir of Haia Kekai in the probate document.  Kalani was also presented with a probate document for Emily Keahi, which indicated she was the daughter of Pili Kekai and had no reference to LCA 6507.  Following Kapu's objection, neither probate document was admitted into evidence.

Kalani testified that his family had kept a 700-page book of family genealogy, which he gave to Kapu's now-deceased former attorney, and that he is unaware of what happened to it.

Over Makila Land's objection, the Circuit Court permitted the jury to ask Kalani the following question: "Are any relatives in the genealogical chain/line buried on land parcel 6507?", to which Kalani responded, "Yes." Makila Land did not cross-examine Kalani further after this question.

During a break in Kalani's testimony, Makila Land sought to introduce additional exhibits, including copies of: (1) a 2001 preliminary injunction, restraining Kapu from preventing Makila Land's access to certain parcels of land, including 'āpana 1 (**2001 Injunction**); (2) a 2015 quiet title judgment in favor of Makila Land and against, *inter alia*, Kapu with respect to 'āpana 3 (**2015 Judgment re 'āpana 3**); and (3) a 2017 quiet title judgment in favor of Makila Land and against, *inter alia*, Kapu with respect to LCA 4878-O (**2017 Judgment re LCA 4878-O**). Makila Land argued the exhibits were relevant as evidence of the Kapu family's conduct in similar situations. In sustaining Kapu's objection to the exhibits, the Circuit Court noted "the prejudicial effect by way of confusion, by way of now suggesting that because some other court did something or failed to [do] something that was never even finalized, it may be construed by them as to be more persuasive or binding." Makila Land also sought to admit the Makila I opinion, which the Circuit Court rejected on the basis that "a legal case is not evidence."

Kapu also testified. According to Kapu, he attempted to pay property tax for 'āpana 1 but was told by the county tax office that he will be unable to until the issues relating to the instant proceeding are resolved. He also testified that he spent

27

a "couple hours" at the State Archives, searching the microfilm census reports for 1865 and 1878 and found no person by the name of Momona living in Lahaina or Honolulu.

Following testimony, Makila Land moved for judgment as a matter of law, arguing that Kapu had not presented admissible evidence to prove the first three links in his chain of title. Specifically, Makila Land asserted the Kapu did not present evidence that Kekue obtained an interest in 'āpana 1 or that she, Keawa Haia, Jr., or Haia Kekai exercised ownership in any way, while the evidence showed that Momona is "the only one who did anything with the property for over another 150 years."[26]  In response, Kapu argued that each of the links in Kapu's chain were addressed by the testimony of Kalani and that the evidence was sufficient to allow a jury to find that Kapu has an interest in 'āpana 1.

In denying the motion, the Circuit Court noted that the evidence of family burials on the land, to wit:  Kalani's answer to the jury question as well as the indication on certain death certificates of a family burial, contradicted Makila Land's argument that "there's no evidence they did anything." Additionally, the Circuit Court determined that the evidence of differing translations of "makuakane" could support the jury finding that Apaa was not Momona's father and that there was no

---

[26]    Makila Land also relied on Makila I's determination that the 1872 lease supported the inference that he was the owner of 'āpana 1.  Makila I, 114 Hawai'i at 71, 156 P.3d at 497 ("Accepting that Momona (1) was Apaa's son; (2) received 'āpana 2 and 3 of Royal Patent No. 3457/LCA 6507 from Apaa; and (3) included 'āpana 1 in the Deed transferring his interest in lands in Royal Patent No. 3457/LCA 6507, it is reasonable to infer that Momona also received 'āpana 1 from Apaa.").

proper chain of title to Makila Land. Finally, the Circuit Court noted that there were questions of fact as to Kekue's date of death and her interest in ʻāpana 1, including whether Kamokulewa was the heir of Apaa, ultimately ruling that "all of this goes to the jury."

During a June 23, 2017 hearing on the parties' proposed jury instructions, the Circuit Court modified and accepted over Makila Land's objection, Kapu's instructions with respect to each party's burden of proof for each link in their respective chains of title and rejected Makila Land's corresponding instruction, citing that Kapu's instruction, as modified, "adds additional factual items for both parties that must be proven . . . especially with respect to Mr. Kapu." Makila Land objected on the basis that its proposed instruction was more concise and "simpler to read."

The Circuit Court also reviewed the verdict form, which it had modified to read, in its entirety:

> Does Makila Land Co, LLC have an interest in the property? _____ Yes _____ No
>
> Does J. Keʻaumoku Kapu have an interest in the property? _____ Yes _____ No

Makila Land stated its objection that its special verdict form would be more appropriate but did not otherwise object to the questions on the verdict form as modified by the Circuit Court.[27] Later that same day, the jury returned its verdict, answering "No" to the first question, and "Yes" to the

---

[27] The parties had each submitted their own proposed verdict forms together with a trial brief on the propriety of a general verdict form as opposed to a special verdict form.

second, *i.e.*, determining that Kapu had an interest in LCA 6507, ʻāpana 1, while Makila Land did not. The Judgment was entered on September 6, 2017.

On September 15, 2017, Makila Land filed ex officio a Renewed Motion for JMOL/New Trial, raising nineteen purported errors, including, *inter alia*, the issues raised in the instant appeal. Following an October 11, 2017 hearing, the Circuit Court entered its October 23, 2017 Order Denying Renewed Motion for JMOL/New Trial (**Order Denying New Trial/JMOL**). On November 1, 2017, Makila Land timely filed a notice of appeal.[28]

## II. POINTS OF ERROR

Makila Land raises four points of error on appeal, contending that the Circuit Court erred when it: (1) denied Makila Land's Second SJ Motion and Renewed Motion for JMOL/New Trial; (2) made several erroneous evidentiary rulings that caused significant and undue prejudice to Makila Land; (3) provided a general verdict form that failed to ask questions adequate to obtain a jury determination of all factual issues essential to judgment; and (4) allowed jury instructions that were, as a whole, prejudicially insufficient.

## III. APPLICABLE STANDARDS OF REVIEW

The appellate court reviews the circuit court's grant or denial of summary judgment *de novo*. <u>Querubin v. Thronas</u>, 107

---

[28] Makila Land did not file its November 1, 2017 notice of appeal within thirty days after the entry of the September 6, 2017 judgment, per Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 4(a)(1). However, pursuant to HRAP Rule 4(a)(3), Makila Land's September 15, 2017 Renewed Motion for JMOL/New Trial extended the initial filing period. Accordingly, Makila Land's notice of appeal, filed within thirty days after entry of the October 23, 2017 post-judgment order denying its Renewed Motion for JMOL/New Trial, was timely. <u>See</u> HRAP Rule 4(a)(3).

Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citation omitted).  The

Hawai'i Supreme Court has often articulated that:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.  In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. (citation omitted).

Pertinent to the review of the Renewed Motion for

JMOL/New Trial, the supreme court has held:

> A trial court's ruling on a motion for judgment as a matter of law is reviewed de novo.  A [motion for judgment as a matter of law] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Ray v. Kapiolani Med. Specialists, 125 Hawai'i 253, 261, 259 P.3d

569, 577 (2011) (citations and internal quotation marks omitted).

> Unlike a directed verdict or JNOV motion, on a new trial motion, [the] movant need not convince the court to rule that no substantial evidence supports [its] opponent's case, but only that the verdict rendered for [its] opponent is against the manifest weight of the evidence.  Both the grant and denial of a motion for new trial is within the trial court's discretion, and [the appellate court] will not reverse that decision absent a clear abuse of discretion.

Richardson v. Sport Shinko (Waikiki Corp.), 76 Hawai'i 494, 503-

04, 880 P.2d 169, 178-79 (1994) (citations and internal quotation

marks omitted).

> We review alleged evidentiary errors as follows:

> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue.  When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong

> standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

Kealoha v. County of Haw., 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993).

"[W]hether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion." Larsen v. State Sav. & Loan Ass'n, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982) (citations omitted).

Finally, with respect to verdict forms and jury instructions, we are guided by the following standards of review: "A trial court has 'complete discretion' whether to utilize a special or general verdict and to decide on the form of the verdict as well as the interrogatories submitted to the jury 'provided that the questions asked are adequate to obtain a jury determination of all factual issues essential to judgment.'" Montalvo v. Lapez, 77 Hawai'i 282, 292, 884 P.2d 345, 355 (1994) (citation omitted). Although there is "complete discretion" over the type of verdict form used, the questions themselves may be so defective that they constitute reversible error. Id. (citation omitted).

> When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

Nelson v. Univ. of Haw., 97 Hawai'i 376, 386, 38 P.3d 95, 105 (2001) (citation and internal quotation marks omitted).

IV.    DISCUSSION

   A.    Second SJ Motion and Renewed Motion for JMOL/New Trial

        Makila Land contends that, because Kapu would bear the burden of proof at trial with respect to his claim to title, his failure to present admissible evidence with respect to each "link" in his purported chain of title ought to have resulted in a judgment against Kapu on his purported claim to 'āpana 1.

        As this court has recognized, it was not Kapu's burden to prove perfect title in order to defeat Makila Land's motion for summary judgment with respect to Kapu's claim.  A & B, 124 Hawai'i at 487, 248 P.3d at 1218 (citing Maui Land & Pineapple Co. v. Infiesto, 76 Hawai'i 402, 408, 879 P.2d 507, 513 (1994)).  Instead, so long as upon viewing all the evidence and the inferences therefrom in the light most favorable to Kapu — as the nonmoving party — the Circuit Court determined there were genuine issues of material fact worthy of trial concerning Kapu's claim to title in 'āpana 1, Makila Land's Second SJ Motion was properly denied.  Id.  Relevant to this determination is the law of the case set forth in Makila I, wherein we determined that the statements in the Kalani Affidavit "allege [Kapu]'s genealogical descent from Kekue, and present[ed] [Kapu] as a viable claimant with standing to contest [Makila Land]'s assertion of ownership of 'āpana 1."  114 Hawai'i at 73, 156 P.3d at 499.  This court also determined that the survey notes were admissible evidence that land matching the description of 'āpana 1 was owned by Kekue.  Id.  Thus, regardless of whether the Kalani Affidavit established how the land passed to Kekue, the evidence supported

33

the reasonable inference that Kekue, at one time, possessed an interest in the land. Viewing all of the evidence and the inferences therefrom in the light most favorable to Kapu, Makila Land did not establish there existed no genuine issue of material fact with respect to Kapu's claim, and the Second SJ Motion was properly denied. See A & B, 124 Hawai'i at 487, 248 P.3d at 1218.

With respect to the Order Denying Renewed Motion for JMOL/New Trial, Makila Land first argues that the Circuit Court allowed Kapu to present a case already proscribed by this court in Makila I, i.e., a claim through Kamokulewa, because Kapu's claim relied upon Kekue's interest in 'āpana 1 having succeeded from Kamokulewa.[29] Makila Land further asserts that the only evidence for this link in Kapu's chain of title was Kalani's "unsupported testimony," which is not sufficient to support the verdict.

First, the assertion that this court's opinion in Makila I barred Kapu from presenting any theory of title involving Kamokulewa lacks merit. This court's holding in Makila I that Kapu's "claim of ownership through Kamokulewa must fail," was based on Kapu's failure to "provide any evidence to show how he would have received land from Kamokulewa." 114 Hawai'i at 73, 156 P.3d at 482. Thus, in the summary proceeding leading to

---

[29]     In his answering brief, Kapu appears to omit Kamokulewa altogether from his purported chain of title, and he argues that Kalani's testimony was sufficient to support a finding that Kamokulewa predeceased Kekue. Additionally, Kapu's proposed jury instructions, modified and given over Makila Land's objection, instructed that the jury must find that "[Kam]okulewa died before Kekua, his mother, and his interest in Land Commission Award No. 6507 'āpana 1 passed to her." Accordingly, we construe Kapu's chain of title claim to 'āpana 1 as including Kamokulewa in like manner.

Makila I, Kapu had not asserted that Kekue succeeded to the interest that Kamokulewa purportedly held. Accordingly, this issue was not actually decided by this court in Makila I and Kapu was not foreclosed from presenting evidence in support of this theory at trial. Cf. Hulihee v. Heirs of Hueu (k), 57 Haw. 387, 388, 556 P.2d 920, 921 (1976) ("If additional evidence is presented in further proceedings on remand, findings as to matters not passed on by the appellate court should be changed or modified in accordance with the trial court's determinations on the entire record.") (citation omitted).

Additionally, we reject Makila Land's argument that Kalani's testimony is insufficient to support Kapu's theory of the chain of title, including the necessary finding that Kekue survived Kamokulewa and that Kekue held an interest in 'āpana 1. Kalani plainly testified concerning his own research indicating that Kekue died without any living children. Kalani then proceeded to testify with respect to each link in the genealogical chain and the succession of the interest in 'āpana 1 to Kapu, pointing to corroborating documents in the record where present. "[T]he testimony of a single witness, if found by the trier of the fact to have been credible, will suffice." In re Doe, 95 Hawai'i 183, 196-97, 20 P.3d 616, 629-30 (2001) (citing State v. Eastman, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996)). Additionally, both parties' expert translations of LCA 6507 indicated that Kekue laid claim to 'āpana 1 at the time of the award, which was completed after Apaa's death. Taken together, the evidence allows for the reasonable inference that Kekue did

not predecease Kamokulewa (and any other potential issue of Kekue and Apaa) but also that she succeeded to Apaa's interest in 'āpana 1.

To the extent Makila Land argues that Kalani's testimony ought to have been excluded at trial as hearsay, we note that Makila Land failed to object to or move to strike Kalani's testimony during trial and appears to have raised it for the first time in its Renewed Motion for JMOL/New Trial. See Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 117, 176 P.3d 91, 116 (2008) ("[G]enerally, a renewed motion for judgment as a matter of law cannot assert a ground that was not included in the original motion. . . . Likewise, a court's entry of judgment notwithstanding the verdict based on an element not argued in the original motion is improper.") (citations omitted); Kalilikane v. McCravey, 69 Haw. 145, 151, 737 P.2d 862, 866 (1987) ("[A] new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that substantial injustice would result.") (citations omitted)), disapproved of on other grounds by Richardson, 76 Hawai'i at 502 n.10, 880 P.2d at 177 n.10.

In any event, the basis for Makila Land's argument is that Kalani purportedly relied *entirely* on a separate family member's, White's, research as the "head genealogist" to support his testimony with respect to the Kapu "family oral history." This misstates Kalani's testimony. In fact, Kalani testified he relied on White's research in the preparation *of his prior affidavit*, submitted in support of Kapu's opposition to Makila

Land's First SJ Motion, which was related to a different genealogy and was excluded from evidence at trial. Kalani testified that he was familiar with his family's genealogical history, having conducted his own genealogical research since 1978.[30] Makila Land does not present any other basis for why Kalani's testimony could not be considered by the jury, and we find none.

Makila Land also argues that Kapu and Pang's testimony did not form a legally sufficient basis for the jury's decision. Specifically, Makila Land argues that Kapu's testimony as to his research into the existence of Momona was inherently unreliable, and that Pang's testimony did nothing to contradict the translation of the 1872 lease. Makila Land further argues that there is no evidence to rebut the statement by Momona in the 1872 lease that Apaa was his father, asserting that the 1872 lease and 1892 deed were "self-authenticating" and presumptively authentic documents and "the jury had no legally sufficient basis to infer or conclude otherwise."

First, it is well settled that it is the role of the jury to assess the credibility of witnesses and accord the evidence whatever weight it determines to be appropriate. See Nakamura v. State, 98 Hawaiʻi 263, 273, 47 P.3d 730, 740 (2002) ("Deference, with respect to the credibility of witnesses and the weight of the evidence, is accorded to fact finders[.]"); State

---

[30]  As Makila Land observes, Kalani did testify that his sister, White, "did most of the visiting" with the elders of their family; however, this does not give rise to the necessary inference that Kalani's testimony derives exclusively from her research.

v. Kekaualua, 50 Haw. 130, 132, 433 P.2d 131, 133 (1967) ("The jury is the sole judge of the credibility of the witnesses or the weight of the evidence." ). Here, the jury was afforded the opportunity to weigh Kapu's testimony as to his research of Momona together with the other evidence relating to Momona and to determine its reliability. Moreover, Pang's testimony squarely addressed the disputed phrase and constituted evidence that the translation could not be definitely established with respect to Momona's paternity. Even without Pang's testimony, Rowland recognized that the Hawaiian Dictionary contains multiple meanings for "makuakane" and that the translation of the term depended on its context. This evidence would support a reasonable jury's determination that Momona was not, in fact, the son of Apaa and thus undermine Makila Land's interest in 'āpana 1.

In sum, based on the evidence and all legitimate inferences which may reasonably be drawn therefrom, we conclude that a reasonable jury could have determined that Kapu held an interest in 'āpana 1 and that Makila Land did not. Similarly, we cannot conclude that the jury's verdict was against the manifest weight of the evidence. Accordingly, the Circuit Court did not err in denying both Makila Land's Second SJ Motion and its Renewed Motion for JMOL/New Trial.

B. Challenged Evidentiary Rulings

Makila Land contends the Circuit Court committed various trial errors, which demonstrate that the record as a whole reflects significant and undue prejudice to Makila Land.

According to Makila Land, these errors unfairly limited its ability to sufficiently challenge the credibility of Kapu and Kalani, while Kapu's claim depended almost entirely on their respective testimonies.

First, Makila Land asserts that the Circuit Court, over Makila Land's objection, erroneously allowed the jury to question Kalani regarding family burials on 'āpana 1 and erroneously admitted Kapu's proffered survey notes, which included a description of Kekue's purported ownership of the property. While Makila Land correctly asserts that burials are not directly relevant to a determination of title, the evidence of family burials on 'āpana 1 was relevant to rebut Makila Land's argument that the Kapu Family had previously failed to take any action indicative of ownership of 'āpana 1 and was therefore relevant in this case. Makila Land has not otherwise argued or demonstrated how this testimony was unfairly prejudicial.

Makila Land also argues that the jury's verdict demonstrated that it ignored the Circuit Court's limiting instruction with respect to the surveyor's description of Kekue's ownership contained in the survey notes. However, "[a]s a rule, juries are presumed to be reasonable and follow all of the trial court's instructions." Sato v. Tawata, 79 Hawai'i 14, 21, 897 P.2d 941, 948 (1995) (citation and internal quotation marks omitted). Makila Land has presented no basis for this court to conclude that the jury in this case failed to comply with the Circuit Court's instruction.

Makila Land also argues that the Circuit Court erred in excluding Uahinui's and Rowland's resumes on hearsay grounds and that this error resulted in unfair prejudice to Makila Land. According to Makila Land, this error "elevated [Kapu's expert, Pang] to the same level" as Uahinui and Rowland, despite Pang's limited experience in translating Hawaiian language real estate documents. However, it has been recognized that the statements contained in curricula vitae and the like are inadmissible hearsay. See 5 Handbook of Fed. Evid. § 702:2 (8th ed.), Westlaw (database updated November 2019) ("Qualifying the witness as an expert should be done on direct examination, and not by the introduction of the expert's curriculum vitae, which in fact is inadmissible hearsay.") (citing United States v. Salva-Morales, 660 F.3d 72, 76 (1st Cir. 2011)). In any event, Makila Land does not argue it was restricted in any way from eliciting from its experts the full extent of their qualifications before the jury or that the jury was erroneously instructed to give each expert equal weight. To the contrary, the record demonstrates that Makila Land was able to establish each expert's extensive experience by way of its direct examination and no prejudice appears to have resulted from the exclusion of their resumes.

Concomitantly, Makila Land argues that the Circuit Court erroneously qualified Pang as an expert, citing Pang's friendship with Kapu and lack of experience in testifying as a lay or expert witness in any previous cases. However, as the Hawai'i Supreme Court has previously recognized:

> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular

> matter, but the expert witness must have such skill,
> knowledge, or experience in the field in question as to make
> it appear that his [or her] opinion or inference-drawing
> would probably aid the trier of fact in arriving at the
> truth. Once the basic requisite qualifications are
> established, the extent of an expert's knowledge of the
> subject matter goes to the weight rather than the
> admissibility of the testimony.

Larsen, 64 Haw. at 304, 640 P.2d at 288 (citations omitted).

Moreover, expert testimony should be liberally admitted at trial.

Ditto v. McCurdy, 86 Hawai'i 93, 107-08, 947 P.2d 961, 975-76

(App. 1997), rev'd in part on other grounds, 86 Hawai'i 84, 947

P.2d 952 (1997).

Here, in qualifying Pang, the Circuit Court specifically noted Pang's "education, his background, his training," in particular, his twenty-five years of teaching the Hawaiian language. It was then a task for the jury to determine the appropriate weight to be given to Pang's testimony, in light of his qualifications and experience. See Larsen, 64 Haw. at 304, 640 P.2d at 288. On the record before us, we cannot conclude that the Circuit Court erred in qualifying Pang as an expert.

Makila Land also argues the Circuit Court erred when it precluded Makila Land from impeaching Kapu and Kalani with evidence of their prior inconsistent or contradictory testimony and conduct in related cases. Specifically, Makila Land points to the exclusion of various legal documents relating to 'āpana 2 and 3, an injunction against Kapu, which involved his alleged obstruction of Makila Land's use of, inter alia, 'āpana 1, this court's opinion in Makila I, the probate documents for "Haia

Kekai, also known as Pili Kekai" and Emily Keahi, and the Paul Kapu Affidavit.

As an initial matter, Makila Land's argument with respect to the Paul Kapu Affidavit appears to be moot, as this affidavit appears to have been admitted as an attachment to the deed Kapu presented as evidence that 'āpana 1 was conveyed to him by his father. With respect to the Makila I opinion, Makila Land seems to assert that this court's *legal* conclusions with respect to Makila Land's First SJ Motion somehow constitute *factual* evidence that ought to have been put before the jury. Makila Land cites no authority to support this proposition, and we find none.

Turning to the probate documents for Haia Kekai and Emily Keahi, Makila Land argues the Circuit Court erred in precluding the admission of these documents to impeach Kalani because they were inconsistent with the genealogy to which Kalani testified. At trial, Makila Land was afforded the opportunity, by way of questioning Kalani, to establish the relevance of these documents with respect to Kapu's proffered genealogy — *i.e.*, that the Haia Kekai referred to in the probate documents was the same individual as the Haia Kekai that Kalani testified to in Kapu's genealogy, the father of John Manuia Kekai, Sr. However, Makila Land failed to establish this connection by way of Kalani's testimony:

> Q. P-11-1 talks about an individual who died on or before February 6th, 1934?
> A. Yes.
> Q. So are we talking about the same individual in both documents?
> A. We're talking about Pili Kekai.
> Q. Pili Kekai, also known as Haia Kekai?

42

**A. No.**
Q. Well, did you not say the document says Haia Kekai?
A. Well, there's no way that Pili Kekai can be his own father.
Q. I'm just asking you what's typed on the document.
A. That's what's on the paper, also known as Pili Kekai, also known as Haia Kekai. Pili cannot be his father is what I'm saying.[31]

(Emphasis added).

Makila Land also did not present any other witnesses or evidence to establish the relevance of probate documents relating certain individuals named Haia Kekai and Emily Keahi. Accordingly, we conclude that the Circuit Court did not err in sustaining Kapu's objection on the basis of relevance. Moreover, to the extent Makila Land argues that this evidence ought to have been permitted for impeachment purposes, we note that Makila Land extensively cross-examined Kalani with respect to their contents and was thus afforded an opportunity to establish any purported inconsistencies before the jury.

With respect to the various documents relating to the other 'āpana, we cannot conclude that the Circuit Court erred in refusing to admit these exhibits. First, we note that Makila Land did not argue before the Circuit Court, as they do on appeal, that these exhibits were admissible into evidence in conjunction with the impeachment of the testimony of Kalani and Kapu; nor did they seek admission of these exhibits after Kalani or Kapu testified with respect to any factual issues addressed by the exhibits. State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940,

---

[31]  Kalani's testimony on direct as well as the death certificates in evidence further supports Kalani's testimony that the individual Kapu and Kalani refer to in Kapu's chain of title as "Haia Kekai" is the father of Pili Kekai, the individual named in the excluded probate documents who died on or about February 6, 1934, and is not otherwise included in Kapu's chain of title to 'āpana 1.

947 (2003) ("[I]f a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases."); JR v. IR, CAAP-17-0000919, 2019 WL 363471, *3 (Haw. App. Jan. 25, 2019) (SDO) (amended) ("Testimony that has not been given cannot be impeached."). In any event, we cannot conclude that the Circuit Court erred in excluding the exhibits based on their potential for confusion. HRE Rule 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues[.]"); Coyle v. Compton, 85 Hawaiʻi 197, 210, 940 P.2d 404, 417 (App. 1997) ("[A]lthough the court might have determined that such evidence was relevant to Plaintiff's credibility, we believe the court could have also properly determined that such collateral matters would lead to 'undue delay [or a] waste of time.'" (citing HRE Rule 403)).

As to relevance, these documents, with the exception of the 2001 Injunction, relate exclusively to separate parcels of land and thus are not relevant to either party's chain of title to ʻāpana 1. Regarding the 2001 Injunction, which pertained, at least in part, to ʻāpana 1, any error in excluding this document was harmless since Kapu's conduct leading to the injunction was consistent with his claim to ownership of the land. Accordingly, we conclude the Circuit Court did not err in its exclusion of certain evidence and reject Makila Land's second point of error.

C.    The Verdict Form

Makila Land contends that the Circuit Court abused its discretion in refusing to use Makila Land's proposed special verdict form and adopting a simplified general verdict form. Makila Land requested a special verdict that would have the jury make a finding as to each step in the chain of title by which Makila Land claimed ownership of 'āpana 1 and each step in the chain of title by which Kapu claimed an interest in 'āpana 1. Makila Land argues that the Circuit Court's decision to make the substance of Makila Land's proposed form "merely jury instructions" was highly prejudicial.

We note, however, that Makila Land did not clearly object to the questions on the verdict form as modified by the Circuit Court; rather their counsel stated, "the change [the court] made to special verdict form we don't object to. We do — I mean, to the — verdict form. I won't use it as special. We do, however, preserve our objection that we believe our special verdict form is more appropriate." (Format altered). In any case, the Circuit Court has "complete discretion" as to whether to utilize a special or general verdict, so long as the questions asked are sufficient for the jury to reach a factual determination on all essential issues. Montalvo, 77 Hawai'i at 292, 884 P.2d at 355.

Makila Land argues that its form of special verdict was necessary to ensure that the jury carefully considered the evidence supporting each of the steps in each party's chain of title. However, this argument is unpersuasive in light of the

specificity of the instructions given to the jury with respect to each party's respective chains of title. As Makila Land acknowledges on appeal, the Circuit Court made the substance of Makila Land's special verdict form into jury instructions, rather than a list of questions for the jury. Accordingly, we conclude that the Circuit Court did not abuse its discretion in utilizing a simplified verdict form under the circumstances of this case.

D.   Jury Instructions

On appeal, Makila Land contends that jury instructions 23 and 24 were prejudicially insufficient. Jury instructions 23 and 24, as quoted in Makila Land's brief, state:

INSTRUCTION NO. 23

The party claiming title has the burden to prove that the party has paper title to the property, or that the party holds title by inheritance, or both. Paper title is conveyance of the property from the owner, as established by documents, or the inheritance of title from a person who died owning it. Probate proceedings are required if the inheritance is through a will, but not if the inheritance is from a person who died intestate; that is, without a will.

INSTRUCTION NO. 24

Paper title is evidenced by a conveyance or a chain of conveyances.

Makila Land did not object to these instructions at trial and, in fact, these instructions were offered as Makila Land's proposed jury instructions 6 and 19, respectively, and were given by agreement.[32]

Makila Land did, however, object to Kapu's proposed jury instructions 23 and 24, which were modified and given to the jury as instructions 31 and 32, in lieu of Makila Land's

_____

[32]   Makila Land's proposed jury instruction 6 was slightly modified by the Circuit Court.

46

corresponding proposed instructions 27 and 28. Jury instructions 31 and 32, as given, provide:

INSTRUCTION NO. 31

Makila must establish each of the following by a preponderance of the evidence:

(1) Apaa was a claimant for a parcel of land at Ko'oka, Lahaina, Maui.

(2) Apaa died in 1848.

(3) The Land Commission issued Land Commission Award No. 6507 to Apaa that included the parcel of land at issue in this case.

(4) Royal Patent No. 3457 was issued unto Apaa.

(5) Momona was the son of Apaa and his heir at law at the time of Apaa's death.

(6) Momona inherited Apaa's interest in Land Commission Award No. 6507, 'āpana 1.

(7) On September 20, 1892, Momona conveyed his interest in Land Commission Award No. 6507 'āpana 1, 2, and 3 to Paul Isenberg and C.F. Horner.

(8) On June 29, 1895, Paul Isenberg and C.F. Horner conveyed Land Commission Award No. 6507 'āpana 1 to Pioneer Mill, Company.

(9) On January 16, 2001, Pioneer Mill Company conveyed Land Commission Award No. 6507 'āpana 1 to Makila.

INSTRUCTION NO. 32

Ke'eaumoku Kapu must establish the following by a preponderance of the evidence:

(1) Apaa was a claimant for a parcel of land at Ko'oka, Lahaina, Maui.

(2) Apaa died in 1848, survived by his wife Kekua (also known as Kekue) and son Mokulewa (also known as Kamokulewa).

(3) The Land Commission issued Land Commission Award No. 6507 to Apaa that included parcel of land at issue in this case.

(4) Mokulewa inherited Land Commission Award No. 6507, 'āpana 1.

(5) Mokulewa died before Kekua, his mother, and his interest in Land Commission Award No. 6507 'āpana 1 passed to her.

(6) Kekua married Keawe Haia, Jr.

(7) Kekua died without any living issue or parents.

(8) Kekua died before Keawe Haia, Jr.

(9) Kekua's interest in Land Commission Award No. 6507 'āpana 1 passed to Keawe Haia, Jr.

(10) Keawe Haia, Jr. died without living issue or parents.

(11) Keawa Haia, Jr. had a brother, Kekai Haia (also known as Haia Kekai) who was alive at the time of Keawe Haia, Jr.'s death.

(12) Keawe Haia, Jr.'s interest in Land Commission Award No. 6507 'āpana 1 passed to Kekai Haia.

(13) Kekai Haia died with surviving children, including John Manuia Kekai, Sr. (also known as Manuia Kekai).

(14) Kekai Haia's interest in Land Commission Award No. 6507 'āpana 1 passed to his surviving children, including John Manuia Kekai, Sr.

(15) John Manuia Kekai, Sr. had children, including John Manuia Kekai, Jr., Joseph Kekai, Hattie Kekai Morada, Elizabeth Kekai Paihinui, and Julia Kekai Kapu.

(16) Julia Kekai Kapu died before John Manuia Kekai, Sr., her father, and John Manuia Kekai, Jr., her brother.

(17) John Manuia Kekai, Jr. died without living issue or parents.

(18) John Manuia Kekai, Jr. had a wife, Alice Kapule, who died before her spouse.

(19) John Manuia Kekai, Jr.'s interest in Land Commission Award No. 6507 'āpana 1 passed to his living siblings and the children of his predeceased siblings: Joseph Kekai, Hattie Kekai Morada, the living children of Elizabeth Kekai Paihinui, and the living children of Julia Kekai Kapu.

(20) Julia Kekai Kapu is the mother of Paul Kekai Kapu (also known as John Paul Kekai Kapu).

(21) Paul Kekai Kapu obtained an interest in Land Commission Award No. 6507 'āpana 1 from John Manuia Kekai, Jr.

(22) J. Ke'eaumoku Kapu is the son of Paul Kekai Kapu.

(23) Paul Kekai Kapu deeded all his interest in Land Commission Award No. 6507 'āpana 1 to his children including J. Ke'eaumoku Kapu.

(24) J. Ke'eaumoku Kapu has an interest in the property.

Makila Land urged the Circuit Court to adopt Makila Land's proposed instructions 27 and 28,[33] arguing:

---

[33] In full, Makila Land's proposed instructions 27 and 28 state:

MAKILA LAND CO., LLC'S JURY INSTRUCTION NO. 27

(Plaintiff's chain of title)

(continued...)

[33] (...continued)

Plaintiff has the burden to prove by a preponderance of the evidence each step or rung in its chain of title.

First, that Momona inherited Apa'a's interest in Land Commission Award No. 6507, Apana 1 from Apa'a.

Second that Momona conveyed his interest in Land Commission Award No. 6507, Apana 1, to Paul Isenberg and C.F. Horner by deed in 1892.

Third that Paul Isenberg and C.F. Horner conveyed their interest in Land Commission Award No. 6507, Apana 1, to Pioneer Mill Company in 1895.

Fourth, that Pioneer Mill Company conveyed its interest in Land Commission Award No. 6507, Apana 1, to Makila Land Co. LLC, in 2001.

MAKILA LAND CO., LLC's JURY INSTRUCTION NO. 28

(Defendant's claim of title)

Defendant has the burden to prove by a preponderance of the evidence each step or rung in Defendant's chain of title:

First, that Kekue received an interest in Land Commission Award No. 6506 [sic], Apana 1;

Second, that Kekue and Apa'a had only one child, Kamokulewa (also referred to as Mokulewa);

Third, that Kekue survived Kamokulewa;

Fourth, that Kekue married Keawe Haia.

Fifth, that Kekue died before Keawe Haia.

Sixth, that Keawe Haia died without children or grandchildren.

Seventh, that Haia Kekai was an heir of Keawe Haia.

Eighth, that Haia Kekai was the only heir of Keawe Haia.

Ninth, that John Manuia Kekai was an heir of Haia Kekai.

Tenth, that John Manuia Kekai had a daughter named Julia K. Kapu[.]

Eleventh, that Julia K. Kapu was the legitimate daughter of John Manuia Kekai at her birth.

Twelfth, that John Manuia Kekai died before Juila K. Kapu.

Thirteenth, that Julia K. Kapu was an heir of John Manuia Kekai.

(continued...)

> <u>We thought our 27 was a more concise instruction</u>
> <u>to -- for what the jury needs to find for our claim of</u>
> <u>title. It's just that the Court's going to -- requires them</u>
> <u>to agree to more steps</u>, and when you look at the Court's --
> I think it's 24, we're going to find that the same few items
> are repeated for both, basically agreeing that that's what
> both parties have put in evidence.
>
> As far as the defendant's claim of interest,
> it's become quite lengthy. It's a little -- even -- even we
> had 16 steps. Now we're up even more than that. <u>We think</u>
> <u>ours is simpler to read. That's really -- with respect to</u>
> <u>Plaintiff's 28, that's our objection. We think it's more</u>
> <u>easy for the jury to understand.</u>

(Emphasis added).

In rejecting Makila Land's proposed instructions and

adopting Kapu's, as modified, the Circuit Court explained:

> I chose to give these . . . because I think this
> adds additional factual items for both parties that must be
> proven and -- especially with respect to Mr. Kapu.
>
> And I do believe they're required, and also, I
> think it's just a little bit more -- I won't say it's more
> clear or concise, but more complete.

On appeal, Makila Land argues that the jury

instructions were "prejudicially insufficient . . . because they

allowed the jury to make a legally unsupported conclusion."

Makila Land fails, however, to identify how the instructions were

deficient with respect to the necessary factual determinations

for each party's claim to ʻāpana 1, especially in light of the

fact that the jury instructions given were more detailed and

extensive than Makila Land's proposed instructions.  Indeed,

Makila Land's argument on appeal is in conflict with Makila

---

[33](...continued)
> Fourteenth, that Julia K. Kapu was survived by a child
> named John Paul Kapu.
>
> Fifteenth, that John Paul Kapu was an heir of Julia K.
> Kapu.
>
> Sixteenth, that John Paul Kapu deeded an interest in
> Land Commission Award No. 6507, Apana 1, to Keʻeaumoku Kapu.

Land's position at trial that the Circuit Court should adopt Makila Land's "simpler" and "more concise" instructions. See Richardson, 76 Hawai'i at 504, 880 P.2d at 179 ("The trial court does not abuse its discretion by refusing a requested instruction that is substantially covered by other instructions, even when the refused instruction is a correct statement of the law.") (citing State v. Pioneer Mill Co., 64 Haw. 168, 180, 637 P.2d 1131, 1140 (1981)). Makila Land presents no other argument that the jury instructions contained incorrect statements of law or otherwise erroneously instructed the jury with respect to the essential elements of the parties' respective chains of title. Accordingly, we cannot conclude that the jury instructions were erroneous and Makila Land's fourth point of error is rejected.

V.   CONCLUSION

For these reasons, the Circuit Court's September 6, 2017 Judgment is affirmed.

On the briefs:

Michael W. Gibson,
Francis P. Hogan,
Benjamin M. Creps,
(Ashford & Wriston),
for Plaintiff-Appellant.

Lance D. Collins,
    and
Bianca K. Isaki,
for Defendants-Appellees
 JOHN PAUL KAPU and
 JONAH KE'EAUMOKU KAPU

/s/ Alexa D.M. Fujise
Presiding Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Derrick H.M. Chan
Associate Judge